# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### GREEN BAY DIVISION

| | |
|---|---|
| TWIN RIVERS PAPER COMPANY LLC, | |
| Plaintiff, | |
| v. | Case No. 1:26-cv-172 |
| COMPLETE PAPER INC. d/b/a BIORIGIN SPECIALTY PRODUCTS, RACHEL VAN WYCHEN, and KIM GERRITS, | |
| Defendants. | |

## COMPLAINT

## PRELIMINARY STATEMENT

1.      "The legal principles which are controlling here are simply the principles of old-fashioned honesty. One man may not reap where another has sown nor gather where another has strewn."[1]

2.      This case concerns a brazen scheme of corporate espionage conducted, in coordination, by BiOrigin Specialty Products—a Twin Rivers competitor—and two former Twin Rivers and current BiOrigin employees.

---

[1] *Mercury Rec. Productions, Inc. v. Econ. Consultants, Inc.*, 218 N.W.2d 705, 711 (Wis. 1974) (quoting *J. I. Case Plow Works v. J. I. Case Threshing Machine Co.*, 155 N.W. 128, 134 (Wis. 1916).

3.      Over the past two weeks, Twin Rivers has discovered that Rachel Van Wychen and Kim Gerrits, two long-time Twin Rivers employees who were entrusted with its trade secrets and confidential and proprietary business information, worked in concert with BiOrigin to abscond from Twin Rivers with that information, deliver it to BiOrigin, and use it for their collective pecuniary gain do the detriment of Twin Rivers.

4.      After being confronted with evidence of their misconduct, Van Wychen, Gerrits, and BiOrigin continue to use Twin Rivers' trade secrets and confidential information against Twin Rivers in the marketplace to gain unlawful advantages with respect to several customer relationships for which BiOrigin and Twin Rivers compete.

5.      These blatant acts of disloyalty by Van Wychen and Gerrits are textbook violations of confidentiality agreements they signed while employed by Twin Rivers.  These acts violated the most fundamental promise underlying their contracts with Twin Rivers, and they have already destroyed a valuable business relationship between Twin Rivers and an important customer, who, on information and belief, was solicited and poached by BiOrigin through the improper and downright unfair use of Twin Rivers' confidential pricing and product information for that customer's Request for Proposal, which had been issued to both BiOrigin and Twin Rivers.

6.      Because BiOrigin, Van Wychen, and Gerrits have refused to return and cease the use of Twin Rivers' confidential, proprietary, and trade secret information, Twin Rivers must seek immediate injunctive relief to prevent further irreparable harm to its business interests.  Twin Rivers also seeks damages under multiple causes of action to repair the harm it has already suffered.

## PARTIES

7.     Plaintiff Twin Rivers Paper Company LLC ("Twin Rivers") is a Delaware limited liability company with its principal place of business in Maine.

8.     Defendant Complete Paper Inc. d/b/a BiOrigin Specialty Products ("BiOrigin") is a Delaware corporation with its principal place of business in Georgia.

9.     Defendant Rachel Van Wychen is an individual who is domiciled in Outagamie County, Wisconsin.  Defendant Van Wychen is a former employee of Twin Rivers.  Defendant Van Wychen is an employee and agent of Defendant BiOrigin.

10.     Defendant Kim Gerrits is an individual who is domiciled in Calumet County, Wisconsin.  Defendant Gerrits is a former employee of Twin Rivers.  Defendant Gerrits is an employee and agent of Defendant BiOrigin.

## JURISDICTION AND VENUE

11.     This action arises under a law of the United States, the Defend Trade Secrets Act ("DTSA") 18 U.S.C. § 1836 *et. seq.*, and the Wisconsin Uniform Trade Secrets Act, Wis. Stat. § 134.90.  The Court thus has original jurisdiction pursuant to the jurisdictional provisions of the DTSA, found at 18 U.S.C. § 1836(c).  The Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367.

12.     This Court has personal jurisdiction over Defendants because Defendants Gerrits and Van Wychen are domiciled in Wisconsin, and Twin Rivers' claims arise out of or relate to Defendant BiOrigin's contacts with Wisconsin.  BiOrigin has purposely availed itself of this Court's jurisdiction, and employs Gerrits and Van Wychen in Wisconsin.

13.     This Court also has personal jurisdiction over Defendants under Wisconsin's long-arm statute.  Defendants' acts and/or omissions within the state of Wisconsin caused injury

to Twin Rivers.  Wis. Stat. § 801.05(3).  Defendants' acts and omissions outside of Wisconsin caused injury to Twin Rivers in this state, and at the time of that injury, solicitation and service activities were carried on within Wisconsin by or on behalf of Defendants.  Wis. Stat. § 801.05(4)(a).  Additionally, this action arises out of a promise by Defendants Gerrits and Van Wychen to perform services for Twin Rivers, as well as the actual performance of services by Gerrits and Van Wychen for Twin Rivers within the state of Wisconsin.  Wis. Stat. § 801.05(5)(a), (b).

14.     This Court also separately has personal jurisdiction over Defendants Gerrits and BiOrigin as this action arises out of a claim to recover a benefit derived by Defendants through the use, ownership, control, or possession by Gerrits and BiOrigin of property situated within this state and a claim that Gerrits and BiOrigin return, restore, or account to Twin Rivers for an asset or thing of value that was within the state of Wisconsin at the time that Gerrits and BiOrigin acquired possession or control over it.  Wis. Stat. § 801.05(6)(b), (c).

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Twin Rivers' claims occurred in this judicial district and a substantial part of property that is the subject of the action is situated in this district.  Venue is also proper in this Court because Defendant Van Wychen is domiciled in Outagamie County, Wisconsin, and Defendant Gerrits is domiciled in Calumet County, Wisconsin.

## FACTUAL BACKGROUND

### I.    Twin Rivers Hires Van Wychen and Gerrits as Sales Employees

16.     Twin Rivers is a 100-year-old specialty paper company that produces packaging, technical, label, and publishing papers for a variety of industries and uses, including packaging papers used in pet food and garden fertilizer bags, grease-resistant papers for the food industry,

and many other product lines. Twin Rivers sells and distributes its goods and services to customers across the United States.

17. Twin Rivers' success in the paper industry is attributable largely to Twin Rivers' technical product innovations, particularly as digitization has substantially decreased customer demand for many paper products. These innovations are reflected in Twin Rivers' trade secret product recipes and specifications, as well as in Twin Rivers' trade secret data regarding the fitness of particular paper grades and formulations for particular customer use cases. Twin Rivers invests substantial time, labor, and other resources into developing such innovations.

18. While Twin Rivers has thrived in this difficult demand environment by virtue of its innovative spirit, many of its competitors—including BiOrigin—have been forced to restructure, shut down their assets, and close paper mills due to their inability to adapt to the changing competitive landscape.

19. BiOrigin competes with Twin Rivers in multiple specialty paper products for many of the same customers.

20. From August 24, 2009 to December 2, 2025, Twin Rivers employed Rachel Van Wychen as Director National Accounts for Twin Rivers' Packaging division.

21. In her role, Van Wychen was responsible for managing Twin Rivers' relationships with several key customers. Accordingly, Van Wychen was provided with access to substantial confidential and trade secret information regarding Twin Rivers' business, including customer information, supplier information, pricing and margin information, financial data, product recipes and specifications, and information about the company's manufacturing processes, techniques, methods and systems. Twin Rivers invests substantial time, labor, and other resources into developing such information, and maintains its confidentiality by maintaining confidentiality

5

policies governing its use and disclosure and employing appropriate information technology policies and controls. To the extent that Twin Rivers discloses portions of this information to customers for business development, Twin Rivers enters into Non-Disclosure Agreements with such customers requiring the customers to likewise keep such information confidential.

22. From August 16, 2021 to January 29, 2026, Twin Rivers employed Kim Gerrits as a Key Accounts Manager for Twin Rivers' Packaging and Technical Papers divisions.

23. Gerrits reported directly to Van Wychen until Van Wychen's resignation from Twin Rivers.

24. In her role, Gerrits assisted Van Wychen in managing Twin Rivers' key customer relationships. Accordingly, like Van Wychen, Gerrits was provided with access to substantial confidential and trade secret information regarding Twin Rivers' business, including customer information, supplier information, pricing and margin information, financial data, product recipes and specifications, and information about the company's manufacturing processes, techniques, methods and systems.

## II. Van Wychen and Gerrits Agree to Confidentiality Agreements

25. Gerrits and Van Wychen both executed confidentiality agreements with Twin Rivers containing identical terms in connection with their respective employment relationships with Twin Rivers.

26. Van Wychen's Employee Confidentiality Agreement states in relevant part:

a. "Employee and Twin Rivers desire to prevent the dissemination or misuse of proprietary or confidential information or materials that Employee may produce or to which Employee may be provided access to . . . ."

b. "Employee agrees that Employee will keep in confidence and will not, except as required in the conduct of Twin Rivers' business or as authorized in writing by

6

the President of Twin Rivers publish, disclose, use, or authorize or assist anyone else to publish, disclose or use, any Confidential Information, or permit any person to examine and/or make copies of any documents which contain or are derived from any Confidential Information, or permit any person to examine and/or make copies of any documents which contain or are derived from any Confidential Information, whether prepared by Employee or otherwise coming into Employee's possession or control."

c.      "Employee agrees that, upon request by Twin Rivers, Employee shall turn over to Twin Rivers, without retaining a copy for Employee all Confidential Information or which is connected with or derived from work whether or not such material is at the date hereof in Employee's possession."

d.      "Employee agrees that disclosure of any work, intellectual property, proprietary information or Confidential Information or breach of any of the agreements contained herein will give rise to irreparable injury to Twin Rivers for which money damages would be an inadequate remedy."

27.    Gerrits' Employee Confidentiality Agreement states in relevant part:

a.      "Employee and Twin Rivers desire to prevent the dissemination or misuse of proprietary or confidential information or materials that Employee may produce or to which Employee may be provided access to . . . ."

b.      "Employee agrees that Employee will keep in confidence and will not, except as required in the conduct of Twin River's business or as authorized in writing by the President of Twin Rivers, publish, disclose, use, or authorize or assist anyone else to publish, disclose or use, any Confidential Information, or permit any person to examine and/or make copies of any documents which contain or are derived from any Confidential

Information, or permit any person to examine and/or make copies of any documents which contain or are derived from any Confidential Information, whether prepared by Employee or otherwise coming into Employee's possession or control."

c.      "Employee agrees that, upon request by Twin Rivers, Employee shall turn over to Twin Rivers, without retaining a copy for Employee all Confidential Information or which is connected with or derived from work whether or not such material is at the date hereof in Employee's possession."

d.      "Employee agrees that disclosure of any work, intellectual property, proprietary information or Confidential Information or breach of any of the agreements contained herein will give rise to irreparable injury to Twin Rivers for which money damages would be an inadequate remedy."

28.      Both Gerrits and Van Wychen's confidentiality agreements define "Confidential Information" as:

a.      "all proprietary materials, customer information, pricing information, knowledge of Twin Rivers' financial condition, information and relationships with resources, suppliers and customers of Twin Rivers, manufacturing processes, techniques, methods, systems and trade secrets of Twin Rivers, its employees, or other subsidiaries, affiliates, agents or customers, whether or not specifically identified as confidential."

29.      In short, Gerrits and Van Wychen are prohibited under their substantively identical confidentiality agreements from sharing Twin Rivers' confidential information for any reason other than to further Twin Rivers' interests.

30.      Gerrits and Van Wychen also agreed to comply with Twin Rivers' company policies and procedures as a condition of their employment.

8

31.     When Gerrits was hired by Twin Rivers, she signed an offer letter, which states that Gerrits agreed "to abide by all current and future policies, rules and procedures established by the Company from time to time."

32.     Twin Rivers' company policies and procedures include, in relevant part, a Code of Business Conduct and an Acceptable Use Policy.

33.     The "Code of Business Conduct – Employees" provides in relevant part:

a.      "Employees must not use for their own financial gain, or disclose for the use of others, Confidential and Proprietary Information regarding Twin Rivers or information obtained from customers and other business partners as a result of their employment that has not been disclosed to the public. For the purpose of this Code, "Confidential and Proprietary Information" includes but is not limited to such things as Twin Rivers' financial information, pricing and financial data, its securities, business and marketing strategies, business operations, plans, employee and human resource information, results of operations, customer and prospective customer names/addresses or non-public information about other companies, including current or potential supplier and vendors or any other Twin Rivers' business information not in the public domain."

b.      "Employees have the obligation to report any violation of applicable laws or this Code of Business Conduct."

c.      "All employees must keep confidential, and not use for themselves or others, all proprietary or confidential information concerning Twin Rivers or its business that has not been disclosed to the public, unless such disclosure is authorized by a senior officer of Twin Rivers. . . . This non-disclosure obligation applies both during employment

9

with Twin Rivers, and after retirement or the termination of employment, for whatever reason."

34.     The Acceptable Use Policy provides in relevant part:

a.      "Users must ensure Company data, confidential and proprietary information, stored in Company IT assets whether owned or leased by the Company, the user or a third party, remains the sole property of the Company. You must ensure through legal or technical means that Company data is protected."

b.      "Users must keep knowledge about information and information systems gained during employment or relationship with the Company confidential; and confidentiality must be maintained after employment or relationship ceases."

c.      "Upon termination of employment or relationship with the Company… [t]he user must immediately return all Company IT assets issued to them or in their possession. The users are expected to cooperate fully with the Company representative to ensure removal of Company data."

d.      "All users must secure and take appropriate care to protect information assets within their custody or care from loss, damage, and/or harm . . . All computing devices must be secured with a password-protected lock screen with approved exceptions. Users must store their passwords in a secure manner."

e.      "Security awareness education will be administered to all users, so they can properly carry out their functions while appropriately safeguarding Company IT assets. Acceptable levels of security awareness comprehension are required for users to retain system access privileges."

f.    "Portable end-user devices, removable devices (e.g., USB sticks) and personally owned devices are prohibited from connecting to networks owned or managed by the Company with approved exceptions."

g.    "Users must not leverage Company IT assets for personal economic gain."

## III.    BiOrigin Recruits Van Wychen and Gerrits

35.    In the fall of 2025, Ken Winterhalter, former Twin Rivers President and Chief Executive Officer and, on information and belief, current Chairman of the Board of Directors or a similar governing body of BiOrigin, began a campaign to recruit Twin Rivers sales employees for potential employment at BiOrigin.

36.    While several Twin Rivers employees who were targeted as part of this effort did not join BiOrigin, Van Wychen, who was offered increasingly generous and above-market compensation packages to accept a new role, ultimately agreed to resign from Twin Rivers and join BiOrigin as its Chief Commercial Officer.

37.    Van Wychen resigned from Twin Rivers effective December 2, 2025 and joined BiOrigin in early December 2025.

38.    After Van Wychen began at BiOrigin, in December 2025, she communicated with Gerrits regarding the possibility of Gerrits joining BiOrigin.

39.    Gerrits claims that she was extended a verbal offer of employment from BiOrigin during the week of January 19, 2026, and was given a written offer on January 23, 2026.

40.    Gerrits provided notice of her resignation from Twin Rivers on January 26, 2026, and was terminated for cause on January 29, 2026, after the facts in this Complaint came to light.

## IV.    Van Wychen Exfiltrates Twin Rivers' Trade Secret and Confidential Information

41.    When Van Wychen resigned from Twin Rivers, Twin Rivers' IT and human resources personnel contacted her to arrange for the return of company devices and data, including company data Van Wychen had stored on a cloud-based Dropbox account shared with Gerrits.

42.    Van Wychen repeatedly made excuses to Twin Rivers as to why she could not return her company devices in a timely way.  Given Van Wychen's long tenure with and senior role at the company, the delay did not initially cause concern and Twin Rivers took several steps to facilitate the return of company data, including providing Van Wychen with a prepaid shipping box with which to return her company devices.

43.    Her delay was intentional and orchestrated, however. On the night of December 2, 2025—the day which she resigned—Van Wychen used a new device, a personal one, to sign into and access the Dropbox account shared with Gerrits to retain access to the Dropbox even after returning her Twin Rivers devices. And roughly a week after her resignation from Twin Rivers and while employed by competitor BiOrigin, Van Wychen made several unsuccessful attempts to access Twin Rivers' Salesforce software using her Twin Rivers email and iPad in an effort to improperly use such sales information in her work for BiOrigin.

44.    In early December 2025, Twin Rivers created a OneDrive file sharing site and instructed Van Wychen to migrate any company data that was on her Dropbox to the company OneDrive, and then to delete the files from her Dropbox.  By this point, Van Wychen was already employed as BiOrigin's Chief Commercial Officer.

45.    On December 15, 2025, Van Wychen informed Twin Rivers that she had "moved the files to the one drive spot you sent and deleted the files."

46.    But Van Wychen had not deleted the files from her and Gerrits' shared Dropbox.

47.     Just days later, on December 19, 2025, Van Wychen, while employed by Defendant BiOrigin, accessed her Dropbox folder, which Twin Rivers has learned contained—and still contains—highly confidential Twin Rivers pricing, profit margin, product specification, and customer sales data. Since her Twin Rivers' devices had been disabled by this point, she must have used a personal device or one owned by BiOrigin to do so.

48.     Van Wychen accessed a file with such data regarding a key Twin Rivers client ("Client One"), and edited that file.

49.     Van Wychen's edit to the Dropbox file resulted in an automatic notification being delivered to Gerrits' Twin Rivers email account, which Twin Rivers later uncovered in the course of its investigation of this matter.

50.     At the time of Van Wychen's unauthorized access to Twin Rivers' confidential pricing, profit margin, product specification, and sales data, both Twin Rivers and BiOrigin were submitting bids in response to a Request for Proposal issued by Client One (the "Client One RFP").

51.     Upon information and belief, Van Wychen used the confidential pricing and customer sales data that she accessed to generate her new employer's BiOrigin's response to the Client One RFP in order to win business from Client One which, in the absence of this conduct, Twin Rivers would have won instead.

52.     Upon information and belief, Van Wychen accessed confidential and trade secret Twin Rivers data via her Dropbox account on multiple occasions while employed by and operating for the benefit of BiOrigin.  Upon information and belief, Van Wychen still retains access to Twin Rivers' data via her Dropbox.

53. Upon information and belief, Van Wychen subsequently instructed or encouraged Gerrits to exfiltrate additional trade secret and confidential information from Twin Rivers while transitioning her employment from Twin Rivers to BiOrigin.

**V. Gerrits Exfiltrates Twin Rivers' Trade Secret and Confidential Information**

54. On January 1, 2026, while employed by Twin Rivers and being recruited for employment by BiOrigin, Gerrits downloaded information from her Twin Rivers company laptop to a personal USB drive in violation of company policy.

55. On January 21, 2026, while employed by Twin Rivers and just days after having received a verbal offer from BiOrigin, Gerrits downloaded confidential, proprietary, and trade secret Twin Rivers company data onto one or more personal USB drives.

56. As of January 28, 2026, these USB drives contained over 900 files consisting of pricing, customer order detail, product specifications, and other confidential and proprietary Twin Rivers company data for at least nine customers. These files are confidential, proprietary, and commercially sensitive because they show how Twin Rivers sought to win or retain business from these customers, including detailed information about Twin Rivers' product offerings, product formulations and specifications, pricing and margin, bids, concessions, and sales strategy.

57. The names of many files on the USB drives reflect that they contain trade secret and confidential and proprietary Twin Rivers company data. For example, file names include phrases such as "Forecasted Demand," "Eco trial history," "Machine Parameters," "pricing in Excel effective 2-1-26," and "RFP Review 12.15.2025."

58. The file name that includes the phrase "RFP review 12.15.2025" refers to one of the submissions Twin Rivers made in response to Client One's recent RFP. Other files contain highly sensitive and confidential information regarding Twin Rivers' response to the outcome of the Client One RFP.

59.     The file "Eco trial history" refers to Twin Rivers' proprietary and trade secret EcoBarrier formulation, which Twin Rivers developed and protected by trademark to adapt to changing market conditions when regulators began to ban the use of "PFAS" chemicals in food-grade paper products.

60.     Gerrits has admitted to Twin Rivers that she tried to download all customer files from her work computer to a USB drive, and prioritized downloading the files of active Twin Rivers customers because of her USB drive's capacity restraints.

61.     As Twin Rivers conducted its investigation of these events, Twin Rivers repeatedly advised Gerrits, while still a Twin Rivers employee, not to delete any files and to retain any USB drives and any other company data in their then-current form.

62.     Notwithstanding these instructions, on January 30, 2026, Gerrits deleted all files from the USB drive and admitted to doing so via email. To date, however, Twin Rivers has been unable to verify that Gerrits actually deleted all Twin Rivers data on any and all USB devices to which she may have previously downloaded such data.

## VI.     Twin Rivers Loses Business as a Result of the Exfiltration

63.     Twin Rivers has been supplying Client One with 51,000 tons of paper product each year under a 2023 contract. On January 8, 2026, Client One notified Twin Rivers that it would materially revise its projected annual purchase volume from 51,000 tons to approximately 36,000 to 41,000 tons, i.e., purchasing 10,000 to 15,000 fewer tons of paper product from Twin Rivers in 2026. The notice from Client One cited materially changed business conditions affecting Client One's demand for Twin Rivers' products, including "competitive market feedback" and "loss of business due to pricing."

64.     In connection with the notice, Client One verbally informed Twin Rivers employees that Client One would be purchasing less from Twin Rivers, and giving more to at least one other competitor because that competitor beat the pricing offered by Twin Rivers.

65.     On information and belief, and given the timing of Van Wychen's and Gerrits's departures during the Client One RFP process, the fact they previously covered the Client One account while employed by Twin Rivers, and the nature of Twin Rivers data they exfiltrated— myriad files regarding Client One, including Twin Rivers' pricing, margin, and product offerings to Client One, even files specific to the Client One RFP—that competitor is BiOrigin.

66.     BiOrigin was able to use the Twin Rivers' information exfiltrated by Van Wychen and Gerrits to its benefit and steal up to 10,000 to 15,000 tons of Client One business, resulting in a loss of between $20 and 30 million in revenue for Twin Rivers.

67.     Several other Twin Rivers customers whose accounts Van Wychen and Gerrits previously covered, and whose account information was accessed and exfiltrated by Van Wychen and Gerrits, have come forward since Van Wychen's departure to inform Twin Rivers that a competitor is offering better pricing.

68.     These Twin Rivers customers have revealed information that suggests that BiOrigin is currently using confidential and proprietary information regarding Twin Rivers' margins to identify particular products in which to compete and not to compete with Twin Rivers, depending on whether they have a competitive advantage relative to Twin Rivers that allows them to lower price while maintaining a sustainable margin.

69.     Twin Rivers sent a letter to BiOrigin on January 28, 2026 demanding that BiOrigin confirm it will sequester and cease using any Twin Rivers data in its or its employees' possession. As of the date of this filing, BiOrigin has provided no such confirmation.

## CLAIMS FOR RELIEF

### Count 1: Breach of Contract
### (Defendants Van Wychen and Gerrits)

70.     Twin Rivers incorporates by reference all foregoing and subsequent paragraphs as though fully set forth herein.

71.     The Confidentiality Agreements between Twin Rivers and Defendant Van Wychen and Gerrits respectively are valid and enforceable contracts between Twin Rivers and Defendants Van Wychen and Gerrits under law.

72.     The Confidentiality Agreements Defendants Van Wychen and Defendant Gerrits entered into with Twin Rivers state in relevant part:  "Employee agrees that Employee will keep in confidence and will not . . . publish, disclose, use, or authorize or assist anyone else to publish, disclose or use, any Confidential Information" and "Employee agrees that, upon request by Twin Rivers, Employee shall turn over to Twin Rivers, without retaining a copy for Employee all Confidential Information or which is connected with or derived from work whether or not such material is at the date hereof in Employee's possession."

73.     Defendants Van Wychen and Gerrits, by their actions alleged above, have materially breached the Confidentiality Agreements causing financial damages to Twin Rivers.

74.     Twin Rivers is entitled to recover its monetary damages.

75.     Twin Rivers is entitled to specific performance, that Defendants Van Wychen and Gerrits be ordered to return all of Twin Rivers' trade secrets, confidential information and any other documents or materials belonging to Twin Rivers, as required by the Confidentiality Agreements.

76. Twin Rivers is also entitled to an injunction restraining Defendants Van Wychen and Gerrits from engaging in further unauthorized use and disclosure of Twin Rivers' confidential information.

77. Twin Rivers is further entitled to actual damages, and attorney fees and other costs.

### Count 2: Violation of 18 U.S.C. § 1836, et seq. (Defend Trade Secrets Act)
### (All Defendants)

78. Twin Rivers incorporates by reference all foregoing and subsequent paragraphs as though fully set forth herein.

79. Twin Rivers owns and possesses certain trade secret information, as alleged above. One example of the trade secret information is new formulations of paper products and associated new use cases. None of this trade secret information was disclosed publicly prior to disclosure to Defendant BiOrigin by Defendants Van Wychen and Gerrits.

80. Twin Rivers has taken reasonable measures to keep the trade secret information at issue secret and confidential.

81. Twin Rivers has at all times maintained stringent security measures to preserve the secrecy of its trade secret information. For example, Twin Rivers maintains confidentiality policies governing the use and disclosure of such information, educates and instructs employees regarding the protection of trade secret information, requires password-protected access to Company computing devices, and monitors to identify suspicious activity.

82. Twin Rivers' trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

83. In violation of Twin Rivers' rights, Defendants Van Wychen and Gerrits misappropriated Twin Rivers' trade secret information by disclosing that information to Defendant

BiOrigin without express or implied consent from Twin Rivers despite knowing or having reason to know that they acquired that information under circumstances giving rise to a duty to maintain its secrecy.

84.     In violation of Twin Rivers' rights, Defendant BiOrigin acquired Twin Rivers' trade secret information through improper means—namely, breach and/or inducement of a breach of Defendants Van Wychen and Gerrits' duty to maintain secrecy and espionage through electronic or other means.  Defendant BiOrigin knew or had reason to know that Twin Rivers' trade secrets were acquired through improper means.

85.     In violation of Twin Rivers' rights, Defendant BiOrigin used Twin Rivers' trade secret information after deriving it from Defendants Van Wychen and Gerrits, who owed a duty to Twin Rivers to maintain the secrecy and/or limit the use of Twin Rivers' trade secret information.  Defendants knew or had reason to know that Twin Rivers' trade secrets were acquired under circumstances giving rise to maintain the secrecy of the information and/or limit the use of the trade secrets.

86.     In violation of Twin Rivers' rights, Defendants Van Wychen and Gerrits used Twin Rivers' trade secret information after acquiring it under circumstances giving rise to a duty to Twin Rivers to maintain the secrecy and/or limit the use of Twin Rivers' trade secret information, and despite knowing or having reason to know that their knowledge of the trade secret information was acquired under circumstances giving rise to maintain the secrecy of the information and/or limit the use of the trade secrets.

87.     Defendants' misappropriation of Twin Rivers' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

88.     Defendants have attempted to, and continue to attempt to, conceal their misappropriation of Twin Rivers' trade secret information.

89.     As the direct and proximate result of Defendants' conduct, Twin Rivers has suffered, and will continue to suffer, severe harm, irreparable injury, and significant damages, in an amount to be proven at trial.

90.     Twin Rivers has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorney's fees.

### Count 3: Violation of Wis. Stat. § 134.90 (Wisconsin Uniform Trade Secrets Act) (All Defendants)

91.     Twin Rivers incorporates by reference all foregoing and subsequent paragraphs as though fully set forth herein.

92.     Twin Rivers owns and possesses certain trade secret information described above. This information constitutes a trade secret as defined Wis. Stat. § 134.90(1)(c).

93.     Twin Rivers has taken reasonable measures to keep the trade secret information at issue secret and confidential.

94.     Twin Rivers has at all times maintained stringent security measures to preserve the secrecy of its confidential, proprietary, and trade secret information.

95.     Twin Rivers' confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

96.     In violation of Twin Rivers' rights, Defendants Van Wychen and Gerrits misappropriated Twin Rivers' trade secret information by disclosing that information to Defendant BiOrigin without express or implied consent from Twin Rivers despite knowing or having reason

to know that they acquired that information under circumstances giving rise to a duty to maintain its secrecy.

97.    In violation of Twin Rivers' rights, Defendant BiOrigin acquired Twin Rivers' trade secret information through improper means—namely, breach and/or inducement of a breach of Defendants Van Wychen and Gerrits' duty to maintain secrecy and espionage through electronic or other means.  Defendant BiOrigin knew or had reason to know that Twin Rivers' trade secrets were acquired through improper means.

98.    In violation of Twin Rivers' rights, Defendant BiOrigin used Twin Rivers' trade secret information after deriving it from Defendants Van Wychen and Gerrits, who owed a duty to Twin Rivers to maintain the secrecy and/or limit the use of Twin Rivers' trade secret information. Defendants knew or had reason to know that Twin Rivers' trade secrets were acquired under circumstances giving rise to maintain the secrecy of the information and/or limit the use of the trade secrets.

99.    In violation of Twin Rivers' rights, Defendants Van Wychen and Gerrits used Twin Rivers' trade secret information after acquiring it under circumstances giving rise to a duty to Twin Rivers to maintain the secrecy and/or limit the use of Twin Rivers' trade secret information, and despite knowing or having reason to know that their knowledge of the trade secret information was acquired under circumstances giving rise to maintain the secrecy of the information and/or limit the use of the trade secrets.

## Count 4: Tortious Interference with Contract
### (Defendant BiOrigin)

100.    Twin Rivers incorporates by reference all foregoing and subsequent paragraphs as though fully set forth herein.

101.    Twin Rivers has valid, enforceable confidentiality agreements with Defendants Van Wychen and Gerrits.

102.    BiOrigin is aware of Defendants Van Wychen and Gerrits' agreements.

103.    Nevertheless, BiOrigin has intentionally interfered with and caused the breach of the agreements. BiOrigin continues to use Twin Rivers' confidential and trade secret information to its commercial advantage.

104.    Defendants' interference caused monetary and other damages to Twin Rivers, including loss of business to Twin Rivers as a result of disclosure of Twin Rivers' confidential information.

### Count 5: Tortious Interference with Business Relationship
### (All Defendants)

105.    Twin Rivers incorporates by reference all foregoing and subsequent paragraphs as though fully set forth herein.

106.    Twin Rivers and Client One had an actual business relationship, as reflected by their existing contract and course of dealing.

107.    Defendants are aware of Twin Rivers' and Client One's business relationship and indeed was in competition with Twin Rivers for market share from Client One.

108.    Nevertheless, Defendants have intentionally and wrongfully interfered with this relationship through wrongful means, including the use of Twin Rivers' confidential and trade secret data (including pricing and product specification and formula information).

109.    Defendants' interference caused monetary and other damages to Twin Rivers, including revisions to the projected annual purchase volume under the existing contract between Twin Rivers and Client One.

## Count 6: Unjust Enrichment
### (All Defendants)

110.    Twin Rivers incorporates by reference all foregoing and subsequent paragraphs as though fully set forth herein.

111.    Through Defendants Van Wychen and Gerrits' prior work with Twin Rivers, Defendants Van Wychen and Gerrits obtained access to information regarding Twin Rivers confidential and trade secret data (including pricing, product specification, and formula information).

112.    Defendants Van Wychen and Gerrits disclosed and are continuing to disclose Twin Rivers' confidential and trade secret data to BiOrigin.

113.    By the conduct described above, Defendants unjustly retain the benefits of Twin Rivers' confidential and trade secret data to the detriment of Twin Rivers, in a manner that violates fundamental principles of justice, equity, and good conscience.

114.    Defendants' conduct enables Defendants to unfairly secure contracts, orders, benefits, prestige, relationships, revenues, and profits.

115.    Defendants were enriched by their actions using Twin Rivers' confidential and trade secret data, such enrichment was at Twin Rivers' expense, and it is against equity and good conscience to permit the Defendants to retain the value derived from Defendants' actions described herein.

## Count 7: Unfair Competition
### (All Defendants)

116.    Twin Rivers incorporates by reference all foregoing and subsequent paragraphs as though fully set forth herein.

117.    Twin Rivers expended time, labor and money in creation of its business and the confidential, proprietary, and trade secret information.

23

118.    Defendants used the confidential, proprietary, and trade secret information. Defendants' actions caused commercial damage to Twin Rivers.

### Count 8: Breach of Fiduciary Duty
### (Defendants Van Wychen and Gerrits)

119.    Twin Rivers incorporates by reference all foregoing and subsequent paragraphs as though fully set forth herein.

120.    Van Wychen and Gerrits were key employees of Twin Rivers.

121.    Van Wychen and Gerrits owed Twin Rivers a fiduciary duty of loyalty to keep confidential Twin Rivers' pricing, sales, and other sensitive commercial data Twin Rivers provided them for use in their employment duties.

122.    Van Wychen and Gerrits breached their fiduciary duty of loyalty by using the information they obtained as agents of Twin Rivers for their personal benefit and the benefit of its competitor, BiOrigin.

123.    Van Wychen and Gerrits' breach have caused harm to Twin Rivers' business and customer relationships.

## <u>JURY DEMAND</u>

124.    Pursuant to Fed. R. Civ. P. 38(b), Twin Rivers demands a jury trial on all claims herein so triable.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Twin Rivers requests that the Court grant the following relief:

1.    Award Twin Rivers damages in an amount to be proven at trial;

2.    Award Twin Rivers a temporary restraining order and preliminary and permanent injunctive relief prohibiting Defendants, and anyone acting on their behalf and/or in concert with

them, from continuing to violate Twin Rivers' rights through the misappropriation, unauthorized use, or disclosure of Twin Rivers' confidential information and trade secrets;

3. Award Twin Rivers mandatory injunctive relief requiring Defendants to immediately return to Twin Rivers and destroy all copies of Twin Rivers' confidential information and trade secrets;

4. Award Twin Rivers specific performance requiring Defendants to perform all obligations under the Confidentiality Agreements, including their obligations to:

a. hold Twin Rivers' confidential information and trade secrets in strict confidence and not disclose it except as permitted by the Confidentiality Agreements;

b. not use Twin Rivers' confidential information and trade secrets, or permit it to be accessed or used, for any purpose other than the Purpose contemplated by the Confidentiality Agreements or otherwise in any manner to Twin Rivers' detriment;

c. protect and prevent the unauthorized disclosure or misuse of Twin Rivers' confidential information and trade secrets by measures at least as restrictive as the measures Defendants use to protect their own confidential information, but with no less than a commercially reasonable standard of care;

d. promptly notify Twin Rivers upon discovery of any loss or destruction, unauthorized access or acquisition, or unauthorized use or disclosure of Twin Rivers' confidential information and trade secrets, and reasonably cooperate with Twin Rivers' efforts to prevent and remediate any such event or breach; and

e. not disclose, nor permit any of its Representatives to disclose to any person: (i) that Twin Rivers' confidential information and trade secrets have been made available to it or its Representatives, or that they have inspected any portion of the confidential

information and trade secrets; (ii) that discussions or negotiations may be, or are, underway between the parties regarding the confidential information and trade secrets or the parties' business relationship, including the status thereof; or (iii) any terms, conditions, or other arrangements that are being discussed or negotiated in relation to the confidential information and trade secrets or any business relationship or transaction between the parties.

5.    Award such other and further relief as the Court deems proper.


Date:  February 2, 2026

*/s/ Christopher E. Duffy*

Christopher E. Duffy
WIED Bar No. 4086179
**King & Spalding LLP**
1290 Avenue of the Americas, 14th Floor
New York, NY 10104
Telephone: (212) 556-2100
E-mail: cduffy@kslaw.com

Frances R. Fink (WI Bar No. 1119705)
**King & Spalding LLP**
500 W. 2nd Street, Suite 1800
Austin, TX 78701
Telephone: (512) 457-2010
E-mail: ffink@kslaw.com

*Counsel for Plaintiff Twin Rivers Paper Company LLC*